OPINION OF THE COURT
Arthur S. Hirsch, J.
Respondent franchisees Shien Tien Yuan and Rita Yuan (Yuans) instituted an arbitration proceeding against Sbarro Holding, Inc., and Sbarro Licensing of Virginia.
Sbarro Holding, Inc., commenced the present proceeding to stay the arbitration as to Sbarro Holding, Inc., on the grounds that the only agreement which provided for arbitration was between the Yuans and Sbarro Licensing of Virginia. The Yuans instituted a second proceeding to join Sbarro Licensing of New York and Franchise Contracting *911 and Equipment Corp., other Sbarro corporations involved in the franchise purchase by the Yuans, as respondents in the then pleading arbitration proceeding.
The two proceedings have been consolidated and a. hearing was held before this court to determine whether Sbarro Holding, Inc., should be compelled to join in the arbitration.
The following will serve to develop the events that began in early 1979, when the Yuans, Taiwanese immigrants without business background or experience, negotiated with an officer of Sbarro, who also held the title of franchise director, for the purchase of a Sbarro fast-food Italian restaurant franchise. They later conferred directly with Mario Sbarro, officer and stockholder in all of the Sbarro corporate entities. Mr. Sbarro assured them during their conversations that the setting up of a fast-food franchise restaurant for the Yuans would be taken care of completely by the Sbarro organization. After further discussions, the Yuans decided to invest in a Sbarro franchise to be located in a shopping mall in Fairfax, Virginia.
It was clear from the beginning that the Yuans were given reason to believe and, indeed, believed that they were dealing with “Sbarro”, a single business entity which, only because of legal technicalities, contracted under the various names, Sbarro New York and Sbarro Licensing of Virginia, or Sbarro Holding Company, Inc. The basic concept understood by the Yuans was that Sbarro would build and have ready for operation, at an agreed cost, a fast-food restaurant duplicating the other Sbarro franchises operated in New York and other States.
In all dealings between the parties, the prevailing presence of “Sbarro” was evident despite reference to affiliated subsidiary companies. There was an inexorable relationship among all the Sbarro entities, evident even in the executed agreements. For example, the Yuans entered into a sublease for the premises with Sbarro Holding Company, Inc., as was required by the terms of the agreement originally with Sbarro New York. Later, Sbarro Licensing of Virginia, an entity created only to comply with Virginia law requiring franchisors of Virginia to be Virginia corpo *912 rations, replaced Sbarro New York on the original agreement. The sublease with Sbarro Holding, Inc., incorporated the franchise agreement with Sbarro Licensing of Virginia, providing that a breach of the sublease would be a breach of the primary franchise agreement with Sbarro Licensing of Virginia. The control of the parent corporation was such that it conditioned compliance of a contract with one subsidiary with compliance of contractors of other offshoot corporations. It is difficult to see how franchisor “Sbarro”, having intruded its will in all the contracts, can now claim its corporations operated separately and apart from each other.
Prior to the signing of the sublease, the franchisees were not told they would have to contract with different named Sbarro corporations. It was not until April, 1980, a year after the execution of the original franchise agreement, that other Sbarro corporations came into the picture. This was after the Yuans had already invested about $40,000. The Sbarro corporations finally involved in the Yuan franchise deal included Sbarro Licensing, Inc., Franchise Contracting and Equipment Corporation, in addition to Sbarro Holding, Inc., Sbarro New York and Sbarro Licensing of Virginia, Inc.
The franchisees had no legal counsel and apparently were discouraged by Sbarro officials from seeking independent legal advice. At no time did a lawyer represent the Yuans when they signed any agreement for the franchise.
The only corporation not part of the Sbarro group was the owner/landlord of the Fairfax, Virginia Mall. In September, 1980, the landlord, claiming construction of the restaurant was not timely commenced (by [Sbarro] Franchise Contracting and Equipment Corp.), terminated the lease, thereby foreclosing the Yuans from opening the franchised restaurant.
On September 25, 1980, Mario Sbarro personally wrote informing the Yuans that the Sbarro superintendent on the job was advised not to proceed, that the Sbarro attorney had contacted the landlord’s attorney on this matter and that “we at Sbarro” wish to comfort the Yuans, now faced with an unfortunate development.
*913 The offer of comfort notwithstanding, the Yuans are entitled to far more than words of condolence. The franchisees, trusting and uninitiated in the corporate entity game, are to put it bluntly, left holding the bag, a bag filled with neither Italian food delicacies nor promised profits.
The linkage between the parties was patently one of trust on one side and superiority on the other. This is the classic example of a relationship, fiduciary in nature, which many authorities have accepted as typical of the franchisor/franchisee association (see Buffington, General Counsel, Federal Trade Comm: Hearings on the “Impact of Franchising on Small Business” before the Subcommittee on Urban and Rural Economic Dev of the Senate Select Committee on Small Business, 91st Cong, 2d Session, 143, 1970).
The relationship as between the franchisor and the franchisee was awesome. The company was to the Yuans: developer, architect, builder, lawyer, supplier and guidance counselor. Sbarro’s representatives convinced their franchisees there was nothing to worry about, Sbarro would handle all. Considering the obvious disparity between the parties, the association was, of necessity, founded on confidence on the part of the Yuans in the integrity and fidelity of Sbarro. As such, neither party had the right, under rules of equity, to take selfish advantage of the trust or to permit either party, particularly the franchisor, to benefit by prejudicing the other. Since hard bargaining is an impossible ingredient with parties in these relationships, each must act with the utmost good faith and with the full knowledge, understanding and consent of the other (Mobil Oil Corp. v Rubenfeld, 72 Misc 2d 392, 399-400).
What is more decisive is the view of the internal operations of the Sbarro corporations. There was one dominating, controlling corporation: Sbarro New York, the developer of the fast-food operation growing out of a family food business, of which the family members are still active real principals. The presence of Mario Sbarro, an officer-director and stockholder in each of the Sbarro corporate entities, reaffirmed the image, assuring franchisees that they were *914 dealing with the Sbarro family, prominently experienced, successful ethnic fast-food restaurant operators.
While stock ownership in each corporation by the persons is not a basis for ignoring the separate entities (Berkey v Third Ave. Ry. Co., 244 NY 84), nevertheless, when one corporation becomes the prime mover or actor in the business of its subsidiaries, the parent will be held liable (Van Valkenburgh, Nooger & Neville v Hayden Pub. Co., 30 NY2d 34). Thus, where a parent corporation’s interference in the subsidiaries’ business is obtrusive, the subsidiaries will be deemed a mere instrumentality or agent 'of the controlling corporation (Fiur Co. v Ataka & Co., 71 AD2d 370, 373-374).
The shifting of funds from one corporate entity to another, most of them bearing the Sbarro name in the corporate title, is further evidence of the control of the parent corporation of its “co-operating” corporations. The facile transferring of the franchisee’s deposit and payment money from Sbarro New York to Sbarro Holding Corporation, Inc., did nothing to alert the Yuans that Sbarro was not actually one single, albeit enlarged, franchise organization. On point is the fact that a check for $28,000, made out by the Yuans to Franchise Contracting and Equipment Corporation, was indorsed and deposited by Sbarro New York. This in itself strongly supports the instrumentality theory (Educational Beneficial v Reynolds, 67 Misc 2d 739). How much more intermingling or interrelationship between the Sbarro corporations could there be?
The separate bookkeeping entities and the legal appearance of independent corporations does not fog the realities. In truth, these corporations were indeed the instrumentalities of the owning company, the Sbarro franchise organization.
It follows that if all corporations are as one corporation, then a contract with any of the subsidiaries is binding on the entire corporation. Accordingly, the contract between Sbarro Licensing of Virginia, requiring the arbitration of disputes, will be applied to Sbarro Holding as if that corporation were a signatory to the agreement.
*915 Sbarro Holding Corporation’s arguments for avoiding arbitration on grounds that no issue of fraud has been raised, without which there is no basis to direct a nonsignatory party to arbitrate, is untenable. While fraud is often an element in the piercing of a corporate veil, corporate entities have been disregarded by courts where the circumstances or the equities so require, despite the lack of the element of fraud (11 NY Jur, Corporations, §§11-12).
Similarly, Sbarro Holding Corporation’s reliance on a recent case (Matter of Goldberg [Kaiser, Heller & Rogers], NYLJ, May 28, 1980, p 6, col 2) is unmerited. In that case, the question of a violation of a California franchise investment statute, as well as California public policy, was raised. In the instant action, the issue, breach of contract, is amenable to arbitration.
Accordingly, the application of Sbarro Holding, Inc., to stay arbitration is denied. The application of Shien Tien Yuan and Rita Yuan for an order joining Sbarro Licensing, Inc., and Franchise Contracting and Equipment Corporation is granted.