CARTE BLANCHE (SINGAPORE) PTE., LTD., Plaintiff,

v.

DINERS CLUB INTERNATIONAL, INC. a/k/a Citicorp/Diners Club, Inc., a/k/a The Diners Club, Inc., and Carte Blanche International, Ltd., Defendants.

No. 88 Civ. 2719 (PKL).

United States District Court, S.D. New York.

March 5, 1991.

See also 130 F.R.D. 28.

Orans, Elsen & Lupert (Sheldon H. Elsen, Lawrence M. Solan and Melissa A. Cohen, of counsel), New York City, for plaintiff.

Proskauer Rose Goetz & Mendelsohn (Steven J. Stein, of counsel), New York City, for defendant Diners Club Intern., Inc.

Kay Collyer & Boose (Nathaniel H. Akerman and Michelena Hallie, of counsel), New York City, for defendant Carte Blanche Intern., Ltd.

## OPINION AND ORDER

LEISURE, District Judge.

Simply stated, the plaintiff in this action is seeking to satisfy a judgment against an assetless corporation by reaching its corporate parent. The matter is before this Court on the parties' cross-motions for summary judgment.

## BACKGROUND

The plaintiff, Carte Blanche (Singapore) PTE., Ltd. ("CBS") is a Singapore corporation. On the defendants' side, a series of corporate relationships must be traced. Defendant Carte Blanche International, Ltd. ("CBI") is a Delaware corporation, which in 1980 was a wholly owned subsidiary of Carte Blanche Corporation ("CBC"), which in turn was a wholly owned subsidiary of Citicorp. In June, 1981, Citicorp acquired defendant Diners' Club, Inc. ("Diners"). On or about September 8, 1982, CBC was merged into Diners. The parties do not dispute that, as corporate successor, Diners assumed CBC's obligations. The major dispute is over whether Diners, the corporate parent, is liable for a judgment against CBI, its subsidiary, in favor of CBS.

Although the parties dispute many of the details, it is clear that CBI tried to establish an international franchise network, which was ultimately unsuccessful. As Diners describes it, CBI was in the business of granting and administering Carte Blanche franchises outside the United States, while its parent, CBC, operated a credit card business within the United States. On August 11, 1980, CBS and CBI executed a Franchise Agreement (the "Agreement") under which CBS became a franchisee of CBI to market and service Carte Blanche credit cards in Malaysia, Singapore and Brunei. The negotiations in

1979 and 1980 leading up to the Agreement were conducted primarily between Marcel Diraison ("Diraison"), senior vice president and chief executive officer of CBI, and Tan Kim Wah ("Tan"), of Global Insurance Company Sdn Bhd, a company wholly owned by Tan and his family. At that time, CBI had approximately seven international franchises.

In the spring of 1981, Rene Gareau, a vice president of CBI began approaching CBI's franchisees to arrange termination agreements. The other franchisees agreed, but in September 1981, CBS refused to be bought out. In November 1981, Seymour Flug ("Flug"), chairman of both Diners and CBI and president of CBI, wrote CBS that "Carte Blanche International operations, which have never achieved world coverage, are in the process of being terminated." PX 21. Some terms of the Agreement were modified to reflect the fact that CBS was now offering its customers an essentially local card. Since 1982, CBI has had no business other than that with CBS.

When CBS became the lone franchisee, CBI continued to provide services to it, but used Diners employees, offices, bookkeeping and bank accounts, rather than maintain separate facilities for a single franchisee that, even in CBS's estimate, paid less than $80,000 per year in royalties.

On or about September 11, 1983, the shareholders of CBS sold 100% of its shares to a newly created company controlled by them called Global Equities PTE, Ltd. ("Global"). In December 1984, 50% of Global's shares were transferred to the MBf Holdings Berhad Group of Companies ("MBf"). CBI claimed that the transfer violated certain provisions of the Agreement and placed CBS under formal notice of default.

Both parties filed demands for arbitration, with CBS claiming that CBI had breached the Agreement by reducing essential services. The dispute was admitted to arbitration in October 5, 1985. An Interim Award dated February 18, 1987, found that CBI had materially breached the Franchise Agreement since at least the fall of 1984 by withholding required benefits and services, and that the stock transfer by CBS to MBf was not a breach. A Final Award of January 28, 1988, awarded CBS damages of $8,993,638.20, plus interest. The award was confirmed, except for the rate of interest on post-judgment amounts due, by order of this Court dated April 8, 1988.[1] The judgment has not been paid.

CBS presents a number of theories under which it claims that Diners is liable for the judgment against CBI, each of which will be discussed in the body of this opinion, along with the facts material to each. Defendants cross-move for summary judgment in their favor on all issues.

## DISCUSSION

### Standard for Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." " 'Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party.' " *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 10 (2d Cir.1989) (quoting *Murray v. National Broadcasting Co.*, 844 F.2d 988, 992 (2d Cir.), *cert. denied*, 488 U.S. 955, 109 S.Ct. 391, 102 L.Ed.2d 380 (1988)).

The substantive law governing the case[2] will identify the facts that are material,

---

1. *Carte Blanche (Singapore) PTE. Ltd. v. Carte Blanche Int'l*, 683 F.Supp. 945 (S.D.N.Y.1988), *aff'd*, 888 F.2d 260 (2d Cir.1989).

2. While plaintiff contends that under the Agreement California law probably governs certain issues raised in this case, plaintiff also asserts that there are no significant differences between the law of New York and California on those issues. Moreover, the parties agree that New York law governs the corporate veil issues. *See* Plain.Mem. at 52 n. 15, 106. Both plaintiff and

and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.... While the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are crucial and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there does indeed exist a genuine issue for trial." *Id.* at 249, 106 S.Ct. at 2511; *see also R.C. Bigelow, Inc. v. Unilever N.V.*, 867 F.2d 102, 107 (2d Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 64, 107 L.Ed.2d 31 (1989). Only admissible evidence is properly considered on a motion for summary judgment. *See, e.g., United States v. Bosurgi,* 530 F.2d 1105, 1111 (2d Cir.1976).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion" and identifying which materials it believes "demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Trebor Sportswear Co. v. Limited Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex, supra,* 477 U.S. at 325, 106 S.Ct. at 2554.

Indeed, once a motion for summary judgment is properly made, the burden then shifts to the nonmoving party, which " 'must set forth facts showing that there is a genuine issue for trial.' " *Anderson, supra,* 477 U.S. at 250, 106 S.Ct. at 2511 (quoting Fed.R.Civ.P. 56(e)). "Conclusory

allegations will not suffice to create a genuine issue. There must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts.' " *Delaware & H. Ry. v. Consolidated Rail Corp.,* 902 F.2d 174, 178 (2d Cir.1990) (quoting *Anderson, supra,* 477 U.S. at 252, 106 S.Ct. at 2512, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)); *see also Carey v. Crescenzi & Herenzy Realty Corp.,* 923 F.2d 18, 21 (2d Cir.1991). "The nonmovant cannot 'escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material facts,' or defeat the motion through 'mere speculation or conjecture.' " *Western World Insurance Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting *Borthwick v. First Georgetown Securities, Inc.,* 892 F.2d 178, 181 (2d Cir.1989), and *Knight v. U.S. Fire Insurance Co.,* 804 F.2d 9, 12 (2d Cir.1986)). In this case, in which both sides have moved for summary judgment, each must sustain the burdens of both movant and nonmovant to avoid summary judgment against it.

### Collateral Estoppel

■ Plaintiff argues that a considerable number of "findings" by the arbitrators must be given preclusive effect in this litigation, and also that the judgment is binding on Diners by principles of res judicata or claim preclusion. As to the latter argument, it is settled law that the arbitrators' ruling against the subsidiary does not establish the personal liability of the parent corporation unless and until a court with jurisdiction over the parent has pierced the corporate veil. *See, e.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 395 U.S. 100, 108–11, 89 S.Ct. 1562, 1568–70, 23 L.Ed.2d 129 (1969); *Eagle Transport Ltd. v. O'Connor,* 470 F.Supp. 731, 733–34 (S.D. N.Y.1979). Because, as discussed *infra,*

defendants rely virtually exclusively on New York law. Under similar circumstances, the Second Circuit applied New York law, stating that "we do not feel obliged to undertake an investigation to determine whether there is any difference in the California law." *Lehman v. Dow Jones & Co.,* 783 F.2d 285, 294 (2d Cir.

1986) (Friendly, J.); *see also Gelb v. Royal Globe Ins. Co.,* 798 F.2d 38, 44 n. 5, (2d Cir.1986), *cert. denied,* 480 U.S. 948, 107 S.Ct. 1608, 94 L.Ed.2d 794 (1987); *Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 52 (2d Cir.1984). Therefore, this Court will apply New York law to the substantive issues in this case.

this Court cannot pierce the veil on the record currently before it, there can be no claim preclusion against Diners at this stage of the litigation.

■ As to collateral estoppel, or issue preclusion, such preclusive effect is given only when "(1) the issue as to which preclusion is sought is identical to the issue decided in the prior proceeding; (2) the issue was necessarily decided in the prior proceeding; and (3) the litigant now opposing preclusion had a full and fair opportunity to litigate the issue in the prior proceeding." *Owens v. Treder*, 873 F.2d 604, 607 (2d Cir.1989) (construing New York law). Defendants assert that in a prior ruling in this case, United States Magistrate Bernikow found that the preclusive effect of the arbitration was limited to the facts necessary to the finding that CBI breached the Agreement, and that this ruling controls as the law of the case. *See Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983).

Plaintiff disputes the weight of the Magistrate's ruling, which was made in the context of a discovery dispute. However, the question can be resolved without applying the doctrine of law of the case, for it is clear to this Court that the preclusive effect of the arbitration goes no farther than what the panel necessarily found, that CBI breached the Agreement, that CBS did not, and the amount of damages resulting from CBI's breach. The facts essential to these findings include that CBI denied cooperation, assistance and certain benefits of the Carte Blanche system to CBS. Most of the other statements to which plaintiff urges the Court to give preclusive effect, such as the panel's comment that the Tans were "misled,"[3] or that the Carte Blanche entities were a single integrated operation, were either clearly identified as "background" information or were just as clearly not essential to the issues decided by the panel.

Indeed, had the arbitrators attempted to determine the liability of Diners, a nonparty to the contract, such a finding undoubtedly would have exceeded the scope of the panel's authority under the agreement to arbitrate. *See, e.g., Kerr–McGee Refining Corp. v. M/T Triumph*, 924 F.2d 467, 469–70 (2d Cir.1991) (citing *Orion Shipping & Trading Co. v. Eastern States Petroleum Corp. of Panama, S.A.*, 312 F.2d 299 (2d Cir.), *cert. denied*, 373 U.S. 949, 83 S.Ct. 1679, 10 L.Ed.2d 705 (1963)). Thus, any findings by the arbitrators concerning the status of Diners can have no preclusive effect in this case.

### Piercing the Corporate Veil

■ The New York Court of Appeals has frequently stated that "[a] principal attribute of, and in many cases the major reason for, the corporate form of business is the elimination of personal shareholder liability," and that "[t]he general rule ... is that shareholders are not personally liable for corporate debts." *We're Assocs. Co. v. Cohen, Stracher & Bloom, P.C.*, 65 N.Y.2d 148, 151, 490 N.Y.S.2d 743, 745, 480 N.E.2d 357, 359 (1985) (citing cases); *see also Itel Containers Int'l Corp. v. Atlant-trafik Express Serv. Ltd.*, 909 F.2d 698, 703–04 (2d Cir.1990). In contrast to tort actions, this presumption is particularly strong in contract cases, in which plaintiff has chosen the party with which it has contracted, and may negotiate guarantees or other security arrangements. *See, e.g., Cascade Energy & Metals Corp. v. Banks*, 896 F.2d 1557, 1577 (10th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990); *Secon Serv. Sys., Inc. v. St. Joseph Bank & Trust Co.*, 855 F.2d 406, 413–14 (7th Cir.1988); P. Blumberg, *The Law of Corporate Groups: Substantive* 488 (1987). Under appropriate circumstances, however, the corporate veil may be pierced and a parent corporation may be held liable for the debts of its subsidiary.

Plaintiff differentiates classic "veil-piercing" from an "alter ego" or agency-type

---

**3.** It is difficult to perceive in what way such a finding, even if given preclusive effect, would aid plaintiff in proving fraud. The arbitrators stated that although they believed the Tans were misled, "there is no reason to believe that anyone involved acted in bad faith," and "the subjective element necessary for a finding of fraud is totally absent." Interim Award at 8.

argument, and argues that a finding of a "single integrated operation" or "common corporate enterprise" constitutes an alternate way to pierce the veil. Common to all of these theories, however, is a requirement of a finding of control or domination of the subsidiary by the parent, whether over the particular transaction at issue or over all aspects of the subsidiary's conduct.

The Second Circuit has noted that the question of piercing the corporate veil is a fact-intensive issue that generally must be submitted to the jury. *See, e.g., American Protein Corp. v. AB Volvo*, 844 F.2d 56 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988). In this case, after reviewing the voluminous papers submitted by the parties, the Court concludes that the issues of control and domination must be submitted to the jury, but that summary judgment may be rendered on a number of other issues.

*I. Piercing the Veil*

Under the familiar test of *Lowendahl v. Baltimore & Ohio R.R.*, 247 A.D. 144, 287 N.Y.S. 62 (1st Dep't), *aff'd* 272 N.Y. 360, 6 N.E.2d 56 (1936), the corporate veil will be pierced and a parent held liable for the debts of its subsidiary if the following elements are established: (1) control amounting to complete domination with respect to the transaction attacked; (2) use of such control to perpetrate a fraud or wrong, including a violation of a positive legal duty; and (3) the control and breach of duty must proximately cause the injury complained of. *See Gorrill v. Icelandair/Flugleidir*, 761 F.2d 847, 853 (2d Cir. 1985) (construing New York law).

*A. First Prong: Domination*

"Factors indicating that a parent corporation controls its subsidiary include lack of normal corporate formality in the subsidiary's existence, under-capitalization, and personal use of the subsidiary's funds by the parent...." *See American Protein, supra*, 844 F.2d at 60. The mere presence of interlocking directorates is a "commonplace circumstance of modern business [that] does not furnish such proof

of control as will permit a court to pierce the corporate veil." *Id.*

Plaintiff presents a number of undisputed facts, all relating to the years 1984 through 1985, the time of breach, that it alleges mandate a finding of control and domination as a matter of law. These include that at the time of breach, CBI had no employees or officers, other than its chairman and president, Flug, who was also chairman of Diners; that CBI was then serviced by two Diners employees; that CBI then had no assets or bank accounts, and all payments to CBI went into Diners accounts, with all expenses paid out of Diners accounts; that after 1983, CBI had no separate offices and conducted all business related to CBS out of various Diners offices; that CBI had no letterhead of its own between 1983 and 1986; that Flug was identified in certain letters and the telex notice of default to CBS as chairman of Diners; and that CBI did not conduct regular board meetings in 1984 and 1985. All of these constitute the type of facts to which courts have often looked in considering the various factors necessary for piercing the corporate veil.

Plaintiff also offers evidence that Diners paid CBI's arbitration expenses, but such evidence is not relevant to establish domination and control by Diners at the time of the breach beginning two years earlier.

Despite the evidence marshalled by plaintiff, defendants have shown that there exists a genuine issue of fact by presenting evidence that, *inter alia*, CBI had at all times a separate corporate function, that of servicing its foreign franchises; that the financial benefits ran from parent to subsidiary, rather than the parent using the subsidiary's funds for its own benefit; and that Flug, despite being an officer of both CBI and Diners, acted as an officer of CBI in his dealings with CBS.

Accordingly, the Court concludes that the issue of Diners' control and domination over CBI at the time of breach, 1984–1985, must be submitted to the trier of fact. The parties' motions for summary judgment on this issue are denied.

## B. Second Prong: Fraud or Wrong

CBS offers two candidates to satisfy the test's second element of the fraud or wrong done it: (1) a fraudulent "wrongful course of conduct," Plaintiff's Memorandum in Support of Motion for Summary Judgment ("Plain. Mem.") at 99; and (2) the breach of contract beginning in or about 1984. However, the actions constituting the allegedly wrongful course of conduct break down into two groups that are both substantively and temporally distinct, and thus call for separate analyses. One involves alleged fraudulent misrepresentation at the time of contracting; the other, allegations of asset stripping beginning several years after signing of the Agreement.

### 1. Misrepresentation

■ The elements of fraudulent misrepresentation under New York law are: a false representation, scienter, materiality, expectation of reliance, justifiable reliance and damage. *See, e.g., Morse/Diesel, Inc. v. Fidelity & Deposit Co.*, 715 F.Supp. 578, 585 (S.D.N.Y.1989). Plaintiff alleges that defendant made two types of misrepresentation, the first consisting of statements and omissions that led Tan, plaintiff's representative in the contract negotiations, to believe that CBI's financial prospects and security were greater than they were, and the second that Tan was led to believe that he was contracting with Carte Blanche as a single unit, i.e., with both CBC and CBI.

■ Misrepresentations regarding financial statements must be not only false, but definite and certain, and must involve more than expressions of opinion or statements concerning future happenings, in order to give rise to an action for fraud. *See, e.g.*, 60 N.Y.Jur.2d § 85, at 556–57. As evidence of the alleged misrepresentations of CBI's financial strength and prospects, plaintiff offers a newsletter distributed by CBI to its franchisees in July 1980, PX 74,[4] and statements made by Steven Brown ("Brown"), an executive of CBI, at a press

conference in June 1980, as reported in the Kuala Lumpur *Business Times*. PX 78. Plaintiff compares the newsletter to an earlier internal report, PX 73, that was not distributed to Tan or the franchisees, which contained an arguably less optimistic analysis of CBI's condition, but fails to provide any evidence that the newsletter contained any false statements of fact. Defendants, on the other hand, present evidence that the statements were accurate. *See* Affidavit of Marcel Diraison, sworn to on May 3, 1990 ("Diraison Aff.") ¶ 23 n. 3. Plaintiff also presents no evidence that the newsletter was read or relied upon by it.

The *Business Times* report also fails to support plaintiff's contentions. The report itself stated that CBI was granting the franchise, and offered no concrete information concerning the financial condition of the company. It quotes Brown as saying no more than that "Citicorp, which acquired Carte Blanche in 1978, considers the Asean region ... as an important market under its expansion programme." PX 78. Another news report of the conference, published in the *Business Star*, attributes the same expansion plans to CBI rather than Citicorp. *See* PX 79.

Tan was not only present at the press conference himself, but testified during the arbitration that the statements as quoted in the *Star* were important to him. *See* Plain. Mem. at 86. Without even considering whether plaintiff can surmount hearsay and other objections raised by defendants, the Court finds no evidence that Tan read or relied on the *Business Week* story, or that the press conference itself or either news report contained any statements that were materially false.

As for plaintiff's allegations that CBI failed to disclose full financial information, it is uncontroverted that plaintiff never requested such information. Plaintiff also cannot demonstrate any affirmative duty to disclose such information in this arms' length business transaction. Plaintiff simply fails to offer more than a scintilla of

---

4. References in the form "PX" and "DX" are to the exhibits submitted with the motion papers by plaintiff and defendants, respectively.

evidence of fraudulent misrepresentation concerning CBI's financial condition.

Reliance is a crucial element of any fraud claim, and any reliance must be justified. *See, e.g., Rosen v. Spanierman,* 894 F.2d 28 (2d Cir.1990); *Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1016 (2d Cir.1989). Defendants present evidence that plaintiff could not justifiably have relied on any misrepresentations concerning the identity of the contracting party, CBI. Defendants submit an affidavit of CBI's negotiator, Diraison, stating that he carefully explained the corporate relationships among Citibank, CBC and CBI. *See* Diraison Aff. ¶¶ 33, 38–43. Tan, when asked during his deposition whether Diraison at any time, or any other officer or employee of CBI in the period from 1979 to 1980, deceived or misled him, answered "No." *See* PX 75, Deposition of Tan Kim Wah ("Tan Dep."), at 514–16. Such a statement is evidence negating reliance. *See, e.g., Apex Oil Co. v. Belcher Co. of New York, Inc.,* 855 F.2d 997, 1008–09 (2d Cir.1988); *Smith v. Russell Sage College,* 78 A.D.2d 913, 432 N.Y.S.2d 914, 916 (3d Dep't 1980), *aff'd,* 54 N.Y.2d 185, 445 N.Y. S.2d 68, 429 N.E.2d 746 (1981).

In addition, Tan's deposition testimony establishes that even if he had previously been unaware of the distinction between CBC and CBI, "when the agreement came, then realize [sic] Carte Blanche Corporation and Carte Blanche International." Tan Dep. at 143. Any continued belief that the two companies were one could not have been reasonable or justified. It is also undisputed that plaintiff addressed its correspondence at all times solely to CBI, and never to CBC or "Carte Blanche" as a unit, further evidence that it was not confused or deceived as to the entity with which it was dealing.

■ Moreover, plaintiff's own operations included a parent company, CBS, with a subsidiary, Carte Blanche Malaysia. It is undisputed that, at the request of CBI, CBS had guaranteed the obligations of its subsidiary under the Agreement. Plaintiff therefore can hardly claim ignorance of the legal distinction between parent and subsidiary corporations, or of the limited liability of a parent corporation for the debts of its subsidiary in the absence of a guarantee.[5]

The facts of this case are distinguishable from those of *Oriental Commercial & Shipping Co. v. Rosseel, N.V.,* 702 F.Supp. 1005 (S.D.N.Y.1988), on which plaintiff relies. In that case, the owner and director of two corporations authorized their employees to distribute brochures describing the thinly capitalized London corporation as the U.K. branch office of the more substantial Saudi Arabian corporation. In addition, an employee of the London company affirmatively represented in contract negotiations that the London office was a branch, and that the Saudi company would provide financial backing for its contracts. *See id.* at 1011–12. The fact of separate incorporation was not revealed to the other contracting parties. As the discussion above makes clear, plaintiff has not presented evidence of such misrepresentation in this case.

Because plaintiff has failed to establish the existence of a genuine issue of fact as to justifiable reliance, the Court need not address the other elements of the alleged fraud concerning CBI's status as a subsidiary. However, the Court notes that, since plaintiff's evidence of domination and control, as well as its claims of damages, re-

---

5. The Court rejects, however, defendants' contention that because plaintiff did not seek a guarantee from CBC, it cannot recover from the parent corporation even if all the other tests for piercing the veil are met. Such a rule is applied only in cases in which the claimant knowingly contracted with an assetless shell; *see, e.g., Brunswick Corp. v. Waxman,* 599 F.2d 34 (2d Cir.1979), or when a party has explicitly requested and been refused a guarantee by one corporation of the obligation of another. *See Itel* *Containers Int'l Corp. v. Atlanttrafik Express Serv., Ltd.,* 725 F.Supp. 1303, 1312 (S.D.N.Y. 1989), *aff'd in relevant part,* 909 F.2d 698 (2d Cir.1990). Neither plaintiff nor defendants in this case contend that, at the time of contracting, CBI was an assetless shell. While there is evidence that, upon receipt of the draft Agreement, Tan inquired as to why Citibank was not named in the contract, there is no evidence that plaintiff ever sought any guarantee from CBC or Citibank.

late primarily to actions taken at the time of breach, plaintiff has not demonstrated a causal link between any of the misrepresentations allegedly made at the time of contracting and its damages. *Cf. Rosen v. Spanierman, supra,* 894 F.2d at 34. As defendants point out, any chain of causation was broken by CBI's 1981 offer of rescission, which at the very least gave notice to CBS that CBI was a separate entity from CBC, and that CBI was in financial difficulties. Thus, plaintiff cannot establish proximate cause in relation to its allegations of misrepresentation.

Accordingly, for the reasons discussed above, summary judgment for defendants is granted on the issue of fraudulent misrepresentation at the time of contracting.

### 2. Asset Stripping

 Plaintiff alleges asset stripping by CBC designed to make CBI a "judgment proof shell." Plain. Mem. at 101. It necessarily follows that proof of a stripping of the assets of the subsidiary by the parent, motivated by a desire to render the subsidiary judgment proof, would constitute a "fraud or wrong" under the *Gorrill* test. *See, e.g., United Rubber, Cork, Linoleum & Plastic Workers of Am., AFL–CIO v. Great Am. Indus., Inc.,* 479 F.Supp. 216, 238–45 (S.D.N.Y.1979); P. Blumberg, *The Law of Corporate Groups: Substantive* § 19.09.01 (1987). However, a genuine issue of fact exists as to whether such asset stripping occurred.

Plaintiff compares financial statements of CBI for the years 1979 through 1982, showing assets in excess of $1 million for each year, PX 26, 28–31, with financial statements of 1984 and 1985, showing zero assets, PX 24, 25. Plaintiff also cites deposition testimony of Robert Peck that between 1984 and 1988, while he was first comptroller and chief financial officer of Diners, CBI had no assets to his knowledge. PX 7, at 20.

Defendants argue that virtually all of CBI's assets consisted of intercompany loans from CBC, and that in every year after 1977 CBI had a negative net worth. *See* Affidavit of Glenn J. Chang, sworn to on ("Chang Aff."), ¶¶ 4, 6; DX 62. Defendants calculate CBI's debt to CBC at $3,393,383 in 1987. Chang Aff. ¶¶ 4, 11.

According to defendants, the fact that after 1984 revenues and expenses were not recorded on CBI's profit and loss statements, or on the balance sheets, "merely reflects an accounting decision to stop recording the minor activities and changes in either assets or liabilities in light of the moribund state of CBI's business at that time. If anything, this accounting decision simply recognized that the losses incurred by CBI's parent would never be recouped and acknowledged the fact that the parent company's investment in the subsidiary was a total loss." Chang Aff. ¶ 9.

It is true that, as defendants argue, a parent corporation is not obliged to continue to infuse cash into a failing subsidiary. *See American Protein, supra,* 844 F.2d at 58, 63. Neither, however, can a parent strip the assets of its subsidiary with impunity. *See, e.g., United Rubber, supra,* 479 F.Supp. at 238–45; *Data Probe, Inc. v. 575 Computer Servs., Inc.,* 72 Misc.2d 602, 340 N.Y.S.2d 56 (N.Y. City Civ.Ct.1972).

Resolution of this question requires the sort of weighing of evidence and evaluation of credibility in which the Court cannot properly engage on a motion for summary judgment. Therefore, the motions of both parties for summary judgment on this issue are denied.

### 3. Breach of Contract

 The arbitrators' finding of a breach of contract by CBI is preclusive in this litigation, as discussed *supra.* Assuming a finding by the trier of fact that CBC did have domination and control over CBI at the time of breach, a further issue of fact exists as to whether CBC used its control to cause the breach of contract.

The Court rejects defendants' argument that Diners had a right to cause CBI to breach its contract with CBS to protect Diners' economic interests. Defendants rely on *American Protein, supra,* in which the court held that "when a possible conflict arises between a director's duty to

honor corporate contractual obligations and simultaneously to protect the stockholders' best interests ... directors of parent companies are released from liability for the contract's dishonor when it results from an effort to protect stockholders, absent a malicious motive." 844 F.2d at 63. However, the Court's holding applied only to a claim of tortious interference with contract, a claim not raised in this case.

By contrast, courts have found liability on a veil-piercing theory when parent companies have caused their subsidiaries to breach contracts when it was in the interest of the parent. *See Gorrill, supra,* 761 F.2d 847; *In re F & S Central MFG. Corp.,* 70 B.R. 569 (E.D.N.Y.1987).

### C. Third Prong: Proximate Cause

Breach of contract being the basis for the damages awarded by the arbitrators, this Court has no hesitation in finding that if plaintiff proves that Diners caused the breach of contract by CBI, it proximately caused the damages resulting from that breach. On the other hand, if at trial plaintiff attempts to establish asset stripping as the second prong of the *Gorrill* test, an issue of fact as to proximate cause will be presented to the jury.

### II. Alter Ego

If domination and control by the parent are sufficiently complete, the parent may be held liable under what is often known as an "alter ego" theory, without a showing that the domination was used to commit a wrong. *See Berkey v. Third Ave. Ry.,* 244 N.Y. 84, 155 N.E. 58 (1926) (Cardozo, J.). However, under this theory, "[d]ominion must be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent." *Id.*

"The corporate veil will be pierced (1) to achieve equity, even absent fraud, where the officers and employees of a parent corporation exercise control over the daily operations of a subsidiary corporation and act as the true prime movers behind the subsidiary's actions, and/or (2) where a parent corporation conducts business through a subsidiary which exists solely to serve the parent." *In re Sbarro Holding, Inc.,* 91 A.D.2d 613, 456 N.Y.S.2d 416, 417 (2d Dep't 1982) (citations omitted).

The second part of this theory has been explicated in the following terms:

> [W]here a shareholder uses a corporation for the transaction of the shareholder's personal business, as distinct from the corporate business, the courts have held the shareholder liable for the acts of the corporation in accordance with the general principles of agency. The determinative factor is whether 'the corporation is a "dummy" for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal rather than corporate ends.'

*Port Chester Elec. Constr. Corp. v. Atlas,* 40 N.Y.2d 652, 656–57, 389 N.Y.S.2d 327, 331, 357 N.E.2d 983, 987 (1976) (quoting *Walkovszky v. Carlton,* 18 N.Y.2d 414, 418, 276 N.Y.S.2d 585, 588, 223 N.E.2d 6, 9 (1966); other citations omitted) (holding that where separate identities of corporations were respected and each corporation pursued separate corporate business, veil should not be pierced).

Several New York cases have pierced the veil upon a finding that a single business "is actually carried on by a larger corporate entity composed of many corporations which, under general principles of agency, would be liable to each other's creditors in contract and in tort." *Walkovszky v. Carlton,* 18 N.Y.2d 414, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966); *see also Worldwide Carriers, Ltd. v. Aris Steamship Co.,* 301 F.Supp. 64 (S.D.N.Y.1968); *In re Sbarro Holding, Inc.,* 111 Misc.2d 910, 445 N.Y. S.2d 911, *aff'd,* 91 A.D.2d 613, 456 N.Y.S.2d 416 (1982). Plaintiff attempts to argue this as a separate theory, but as the language quoted above indicates, it represents little more than one of the many formulations of the "alter ego" theory, and it requires no separate analysis, particularly since plaintiff relies on identical facts in support of both claims.

The evidence before the Court demonstrates that genuine issues of fact exist as

to the extent of CBC's control over the actions of CBI at the time of the breach of contract. CBS concedes that at the time of contracting, CBI was not a shell. Plain. Mem. at 18. A trier of fact could reasonably conclude either that CBI had at all times a separate identity and business purpose from that of CBC and Diners, and that Diners merely accommodated its subsidiary or, as CBI's largest creditor, properly protected its own interests by assisting its subsidiary; or that at the time of breach CBC management controlled the activities and finances of its subsidiary and improperly directed them for Diners' purposes. Therefore, the motions of both parties for summary judgment on this issue must be denied.

### Agency

New York courts have held that "when ... the facts are not disputed, the question of agency should be resolved by the court." *Plymouth Rock Fuel Corp. v. Leucadia, Inc.*, 100 A.D.2d 842, 474 N.Y.S.2d 79, 81 (2d Dep't 1984) (citing *Hedeman v. Fairbanks, Morse & Co.*, 286 N.Y. 240, 248, 36 N.E.2d 129 (1941)).

Plaintiff raises agency arguments separate from its alter ego theory, based on the events surrounding the formation of the contract rather than the breach. Plaintiff asserts theories of actual and apparent authority, as well as ratification, to argue that Diners is directly liable on the contract.

### I. Actual Authority

Actual authority arises from a manifestation of consent from principal to agent. *See, e.g., Itel Containers, supra,* 909 F.2d at 702–03; *Empire Communications Consultants, Inc. v. Pay TV*, 126 A.D.2d 598, 510 N.Y.S.2d 893 (2d Dep't), *appeal dismissed,* 69 N.Y.2d 1037, 517 N.Y.S.2d 1030, 511 N.E.2d 89 (1987); *Kingston Dry Dock Co. v. Lake Champlain Transp. Co.*, 31 F.2d 265 (2d Cir.1929). Such consent can be either express or implied from "the parties' words and conduct as construed in light of the surrounding circumstances." *Riverside Research Inst.*

*v. KMGA, Inc.*, 108 A.D.2d 365, 489 N.Y. S.2d 220, 223 (1st Dep't 1985), *aff'd,* 68 N.Y.2d 689, 506 N.Y.S.2d 302, 497 N.E.2d 669 (1986). If actual authority exists, a disclosed principal may be liable on a contract in which it is not a named party, provided that the contract is made by an agent acting within its authority, in the proper form, and with the understanding that the principal is a party. Restatement (Second) of Agency §§ 144, 147, 149 (1958). Plaintiff contends that CBC is liable as a disclosed principal to the Agreement.

Plaintiff bases much of its argument that an agency-principal relationship existed on language contained in the Agreement itself. The Franchise Agreement included the following language:

### STATEMENT OF PURPOSE

(1) Carte Blanche Corporation ("Carte Blanche") owns and operates a general purpose credit card business ... and either by itself or pursuant to agreements through others issues credit cards.... (2) The name Carte Blanche is a registered service mark of Carte Blanche....

. . . .

(4) By agreement with Carte Blanche, CBI is the duly authorized contracting corporate entity to make available for use by franchisees the service mark CARTE BLANCHE.... Pursuant to its agreement with Carte Blanche, CBI will exercise quality control over Franchisee on behalf of Carte Blanche.

. . . .

(6) CBI is willing, on behalf of Carte Blanche, to grant such a license to Franchisee upon the terms and conditions set forth in this Agreement.

. . . .

### SECTION 2

2.01 (a) CBI on behalf of Carte Blanche hereby grants Franchisee an exclusive license for the term of this Agreement, to use the service marks and names owned by Carte Blanche ... and the rights to operate and conduct such busi-

ness only in accordance with the Carte Blanche System, and CBI "Operational Rules"....

Agreement at 4–5, 8.

However, this language cannot in itself establish actual authority. First, the preamble to the Agreement states explicitly that the Agreement is executed "by and between" CBI and CBS, with no mention of CBC. Agreement at 4. Thus, not only is CBC not a named party to the contract, but the Agreement itself contains no representations by CBC, the purported principal, to either CBI or CBS as to CBI's authority as its agent. Second, the use of the phrase "on behalf of" does not in itself establish an agency relationship, particularly in the absence of explicit language of agency. *See, e.g., General Auth. for Supply Commodities v. S.S. Capetan Costis I,* 631 F.Supp. 1488, 1490 (S.D.N.Y.1986) (applying contract law). Third, the "on behalf of" language follows the other provisions of the Agreement that explain CBC's ownership of the service mark, and the agreement between CBC and CBI that CBI, as a separate corporate entity, was authorized to make the mark available to franchisees. Thus, the most natural construction of the contract is that CBI is carefully delineating its own rights to franchise the Carte Blanche service mark, which would presumably be unnecessary if CBC were franchising its own mark.

Plaintiff also asserts that a number of acts by CBC manifest CBI's actual authority to contract on its behalf. In June 1980, prior to the execution of the Agreement, letters on CBC letterhead were sent by Diraison to the Registrars of Companies in Singapore and Malaysia on CBC letterhead announcing that "Messrs. Fong Wai Faun and Tan Kim Wah are authorized to use our corporate name and trademark 'Carte Blanche' in conjunction with the formation of a company that will have a franchise relationship with this company. We have no objection to the formation of such Company using our name and trademark." PX 80. In addition, a press release was issued in September 1980, in which CBC "proudly announces the licensing of Carte Blanche Malaysia and Carte Blanche Singapore as its Franchisees in Malaysia, Singapore and Brunei." PX 89.

However, the Court cannot find that these documents establish the existence of an agency. The letters demonstrate nothing more than that CBC was clarifying the status of the use of its trademark by CBS. While the language of the press release is more suggestive, in such a document released to the general public, oversimplification of corporate relationships is often excused by courts. *See, e.g., Japan Petroleum Co. (Nigeria) Ltd. v. Ashland Oil, Inc.,* 456 F.Supp. 831, 846 (D.Del.1978).

Much of the other material offered by plaintiff as "evidence" of actual authority is irrelevant. The hindsight opinion of Steven Brown, an executive of CBI at the time of contracting, that it was an agency agreement, is irrelevant, as is Tan's "sense" of the situation. The fact that Diraison was an officer of both CBC and CBI cannot in itself bind CBC to a contract signed by CBI.

As noted above, when the facts are not in dispute, the question of agency is for the court. The evidence before the Court in this case is too slight to support a finding that, as a matter of law, CBI was an agent of CBC authorized to bind it to the Agreement. Summary judgment for defendants is granted on this issue.

## II. Apparent Authority

Apparent authority results from a manifestation of consent by a principal to a third party. "When a party deals with an agent he does so at his peril, and must make the necessary effort to discover the actual scope of authority. In any event, a third party can invoke the doctrine of apparent authority only when the words or conduct of the *principal,* communicated to the third party, have caused the third party to believe that an agent has authority to contract on the principal's behalf." *Legal Aid Soc'y v. Economic Opportunity Comm'n,* 132 A.D.2d 113, 521 N.Y.S.2d 833, 835 (3d Dep't 1987) (citations omitted); *see also Itel Containers, supra,* 909 F.2d at 703; *Meshel v. Resorts Int'l of New*

*York, Inc.*, 160 A.D.2d 211, 553 N.Y.S.2d 342, 343 (1st Dep't 1990). A principal thus may be held liable only when it was responsible for the appearance of authority in the agent, and reliance on apparent authority must be justified. *See UA–Columbia Cablevision v. Fraken Builders, Inc.*, 96 A.D.2d 509, 464 N.Y.S.2d 814 (3d Dep't), *appeal dismissed*, 60 N.Y.2d 838, 470 N.Y.S.2d 141, 458 N.E.2d 382 (1983); 2 N.Y. Jur.2d § 86. Such liability is generally said to rest on estoppel principles.

Plaintiff's allegations of appearance of authority in CBI are the same facts relied on for its claim of actual authority.

In *Legal Aid, supra*, the Appellate Division affirmed the dismissal of a claim both because of lack of evidence that the alleged reliance was caused by the alleged principal, and because, despite several conversations among the parties concerning a possible contract, the party alleging apparent authority admitted that it never inquired into the scope of the agent's authority.

In this case as well, the evidence establishes a failure to inquire into the exact scope of CBI's authority, if not actual knowledge that CBI was contracting only for itself. Further, as discussed *supra* concerning plaintiff's allegations of fraudulent misrepresentation, CBS does not present evidence of any representations made by CBC, the alleged principal, to CBS that might have induced it to rely on CBI's apparent authority. Even if the language of the press release and letters could constitute such representations, these public announcements of the outcome of the negotiations over the Agreement were obviously made after those negotiations took place. Thus, as a matter of law, CBS cannot establish the necessary reliance. Summary judgment is granted to defendants on the issue of apparent authority.

### III. Ratification

 Under the doctrine of ratification, a party may be held liable as a principal "as a result of his affirmance of an act done by one who purports to be acting for the ratifier." *J.M. Heinike Assocs., Inc. v. Chili Lumber Co.*, 83 A.D.2d 751, 443 N.Y.S.2d 512, 513 (4th Dep't 1981) (citing Restatement (Second) Agency §§ 82, 83, 85).

For the same reasons that the Court has found a lack of evidence to support plaintiff's claims that either defendant fraudulently misrepresented CBI's status as a subsidiary, or that CBC caused plaintiff to rely on CBI's apparent authority, the Court finds no evidence to support plaintiff's claim that in negotiating the Agreement, CBI purported to be acting as CBC's agent.

Summary judgment is granted to defendants on the issue of ratification.

### Assumption

 Plaintiff asserts, as a separate argument, that Diners should be held liable because it "by the time of the breach, and indeed much earlier, Diners had assumed all the obligations of the Franchise Agreement and had accepted all the benefits." Plaintiff's Reply Memorandum in Support of Motion for Summary Judgment and in Opposition to Cross Motion for Summary Judgment ("Plain. Reply") at 53. However, most of the authority cited by plaintiff on this point consists of veil-piercing or alter ego cases, and plaintiff's proffered evidence on this issue is likewise repetitive of its veil-piercing argument. Plaintiff also relies upon *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50 (2d Cir. 1984), in which a jury found an express agreement by a controlling shareholder and corporation to assume the obligations of a company taken over by them. There is no evidence of such an agreement in this case, and therefore the Court can find no separate ground for recovery in this case based on assumption. Thus, summary judgment for defendants is granted on this issue.

### CONCLUSION

For the reasons set forth above, plaintiff's motion for summary judgment is denied. Defendants' cross-motion for summary judgment is granted on the following issues: fraudulent misrepresentation at the time of contracting; agency, including actual authority, apparent authority, and ratification; and assumption. Defendants'

cross-motion for summary judgment is otherwise denied.

In view of the demonstrated tendency toward verbosity of the parties to this action—memoranda of law alone submitted in connection with this motion total over 460 pages—the Court hereby imposes a limit on briefs for any motion for reargument by any party, and will not consider any memoranda of law longer than fifteen pages.

SO ORDERED.