### In re INSITE SERVICES CORPORATION, LLC, Debtor.

### InSITE Services Corporation, LLC, Plaintiff,

### v.

### American Electric Power Co., Inc., AEP Energy Services, Inc., and Mutual Energy Service Co., LLC, Defendants.

Bankruptcy No. 01–42074 (ALG).

Adversary No. 01–3563 (ALG).

United States Bankruptcy Court, S.D. New York.

Nov. 27, 2002.

Robert E. Grossman, Schuyler G. Carroll, Olshan, Grundman, Frome, Rosenzweig & Wolosky, LLP, New York City, for InSITE Services Corporation, LLC.

M.O. Sigal, Jr., Daniel H. Tabak, Simpson, Thacher & Bartlett, New York City, for American Electric Power Company, Inc., AEP Energy Services, Inc. and Mutual Energy Service Company, LLC.

## MEMORANDUM DECISION AND ORDER

ALLAN L. GROPPER, Bankruptcy Judge.

InSITE Services Corporation, LLC, a Chapter 11 debtor, has brought an adversary proceeding seeking damages for breach of contract, injunctive relief, and reinstatement of a certain services agreement. The Plaintiff's claims are asserted against defendants American Electric Power Company, Inc., AEP Energy Services Inc., and Mutual Energy Service Company, LLC (collectively referred to as the "Defendants").

Mutual Energy Service Company, LLC now moves pursuant to Bankruptcy Rule 7012(b)(6), incorporating Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all of the claims against it on grounds that the plaintiff has failed to plead the required elements of each of its causes of action and that the plaintiff's exhibits, incorporated in the complaint, conclusively contradict certain of the factual allegations critical to maintenance of its claims.

Defendants American Electric Power Company, Inc. and AEP Energy Services Inc. separately seek dismissal pursuant to Bankruptcy Rule 7012(b)(6) for plaintiff's failure to allege sufficient facts to permit the piercing of the corporate veil.

### A. The Facts as Alleged in the Complaint

The following facts alleged in the complaint, presented in the light most favorable to the Plaintiff, are assumed to be true for purposes of this motion.

InSITE Services Corporation, LLC ("InSITE" or "Plaintiff" or "Debtor") is, or was, engaged in the business of providing computerized billing services to electrical utilities. It was formed in 1996 to service the deregulated retail electricity market. To this end, the Debtor developed and utilized a web-based billing application service named EnerBill that (in computer terminology) "hosts" certain software marketed under the name "Peace." Secret technical and business processes developed by InSITE constitute the core of the EnerBill application. These processes gave InSITE an advantage over competing billing-service providers, and they are allegedly the means by which InSITE was able to modify the Peace software to accomplish billing in the unregulated electricity market. As of April 1999, the Debtor was employing EnerBill

to operate Peace software for two unregulated electricity suppliers.

American Electric Power Company, Inc. ("AEP") is a holding company with subsidiaries that generate, sell, and trade electricity in both the regulated and unregulated markets. It is the ultimate parent corporation of defendants AEP Energy Services Inc. ("AEP Services") and Mutual Energy Service Company, LLC ("Mutual Energy"). AEP Services sells or trades electricity and gas in the wholesale, unregulated markets, and Mutual Energy was created to facilitate AEP's entry into the unregulated retail electricity market. It is not clear from the complaint when Mutual Energy was actually formed.

In January 2000, AEP Services invited InSITE to submit a bid to become the billing service provider for Mutual Energy. This was a great opportunity for InSITE; by obtaining the Mutual Energy contract, the Debtor would become a leading billing services provider and gain great profit potential. Plaintiff alleges that AEP and AEP Services controlled all aspects of the selection process, including analyzing the bids of the potential service providers.

On or about May 1, 2000, AEP notified the Debtor that it had been selected as the billing-services provider. During that same month InSITE and AEP Services signed a letter of intent, and it was late that month that AEP, AEP Services and the Debtor began negotiating a services contract. Steve Appelt, an AEP vice-president and second highest-ranking executive in AEP Services, led the negotiation team for AEP, assisted by Robert Goumaz, an executive of AEP Services. InSITE was chosen despite its relatively brief track record; in connection with Defendants' due diligence review of InSITE's credentials, InSITE disclosed that it would require an additional $30 million in financing to equip itself to process the volume of

billing contemplated by a Mutual Energy contract. While the details of the contract were being finalized, in September 2000, InSITE, with Mr. Appelt's knowledge, began the process of securing the additional $30 million in financing that it required.

It is undisputed that the Debtor and defendant Mutual Energy entered into a services contract (the "Agreement"), negotiated and approved by AEP, under which the Debtor would provide billing services for Mutual Energy. Appelt signed the Agreement as an officer of Mutual Energy on or about November 15, 2000. The Agreement was for a five-year term commencing on November 15, 2000, and ending five years after the date a Mutual Energy customer was first invoiced. Although the Agreement does not specify the date Mutual Energy was to enter the market, the complaint alleges that it was understood by the interested parties—AEP, AEP Services and the Debtor—that Mutual Energy was to "go live," i.e., begin providing services, on January 1, 2001, in Ohio. AEP also anticipated converting its 1.2 million regulated Texas customers to unregulated Mutual Energy customers by January 2002. Until the Ohio "go live" date, InSITE's obligations under the Agreement were limited that is, InSITE was to focus on preparing Mutual Energy to become an EnerBill customer. InSITE has alleged that it fulfilled this obligation.

The Agreement contains three different termination procedures. The Agreement could be terminated "for convenience" between August 1, 2001 and December 31, 2001, under section 4.3.2. Alternatively, it could be terminated after the "go live" date under section 4.3.1, or for material breach under section 4.2.2. A termination "for convenience" required that Mutual Energy perform an audit and determine that InSITE would be incapable of providing services in support of Mutual Energy's

entry into the Texas market. A termination "for convenience" would also require Mutual Energy to reimburse InSITE for certain costs, not to exceed $500,000. If termination were to occur after the "go live" date, Mutual Energy would be required to render a payment to InSITE based on a sliding scale contained in the Agreement. Either party could terminate for cause based on a material breach; however, the breaching party could cure any breach within thirty days after written notice, with the ability to extend the cure period by thirty additional days if the breaches could not be cured within the initial period.

Sections 5.2 and 5.5 of the Agreement acknowledged that InSITE owned all copyright and other rights in its pre-existing intellectual property, including its EnerBill secret processes. InSITE licensed to Mutual Energy only the intellectual property that it would develop in the course of performing its obligations under the Agreement. However, if Mutual Energy were to terminate the Agreement for any reason other than for cause, it could not exercise its license until three years after the first commercial use of the intellectual property. Also, the Agreement provided InSITE with protection against a raid on its human capital by prohibiting Mutual Energy from soliciting InSITE's employees during the term of the Agreement and for six months following termination. There is no such prohibition if the Agreement were terminated for cause.

Some time after entering into the Agreement, according to the complaint, AEP began to contemplate a sale of its unregulated retail electricity business, including Mutual Energy's anticipated retail sales customer base. AEP believed that Mutual Energy would be particularly attractive to a potential buyer if it had the capacity to perform all billing in-house.

Since AEP lacked the expertise to develop the appropriate billing program, to facilitate its goal of selling Mutual Energy, AEP began to urge InSITE to perform extra-contractual duties, mainly to develop and integrate the external business processes of AEP's third-party vendors. Additionally, AEP obtained InSITE's secret pre-existing processes under the guise that Mutual Energy needed to perform an audit.

After this point, the complaint further alleges, the relationship between the parties began to deteriorate. AEP began to order postponements of the established "go live" dates. Initially, the postponement was due to AEP's marketing department's failure to locate a sufficient number of customers for Mutual Energy. Eventually, in January 2001, AEP notified the Debtor that it was dropping its plans for Mutual Energy to enter the Ohio market, and that the "go live" date, now in Texas, would be delayed from June 2001 until September 1, 2001.

From January 2001 forward, the complaint continues, Mutual Energy began to hinder InSITE's preparations for the Texas "go live" date. These hindrances included Mutual Energy's failure to provide InSITE with the correct version of Peace software needed to support Mutual Energy's customer base and its failure to complete interfaces that would integrate other vendors into the billing software. Additionally, Mutual Energy failed to select other vendors for the Texas pilot on a timely basis. This delay impaired InSITE's ability to customize EnerBill for Mutual Energy's application. Also, Mutual Energy failed to provide the Debtor with information about its Texas customer base. Meanwhile, AEP assertedly sabotaged InSITE's attempts to obtain needed financing. For example, AEP broke off ongoing negotiations with one of InSITE's

proposed strategic partners and informed InSITE that it would not support any of its attempts to form a strategic partnership.

On or about April 17, 2001, Goumaz forwarded to InSITE a letter, on AEP Services letterhead, that purported to be a thirty-day notice of termination of the Agreement for cause (Complaint Exh. 2); the notice listed eighteen alleged breaches of the Agreement by InSITE. The Debtor refuted the purported breaches in a letter dated April 18, 2001 (Complaint Exh. 3), and a meeting was held on April 26, 2001 between the Debtor and Messrs. Appelt and Goumaz. At this meeting, Goumaz informed the Debtor that AEP would not permit InSITE to obtain financing through a strategic partnership because AEP was determined to bring all billing services in-house. The Debtor informed Messrs. Appelt and Goumaz that InSITE might have to file a bankruptcy petition, and Goumaz requested that they be provided advance notice of such a filing.

After the April 26th meeting, Goumaz began to reassure the Debtor that Mutual Energy would not terminate the contract so long as InSITE cured the breaches that had been alleged. The parties exchanged another series of letters wherein Goumaz maintained that InSITE was in breach, and InSITE maintained it was not (Complaint Exh. 4 and 5). This correspondence prompted the scheduling of another meeting in May 2001. After In-SITE and executives from another of its proposed strategic partners, Enlogix, flew to Tulsa, Oklahoma, Goumaz refused to meet with them. In response, the Debtor prepared an action plan and forwarded the same to Goumaz. Subsequently, still another meeting between Goumaz, InSITE and Enlogix was scheduled and held on or about May 24, 2001. At the May 24th meeting, Goumaz allegedly maintained

that the Agreement would not be terminated. On May 31, 2001, InSITE directed its counsel to file a bankruptcy petition, and it notified Goumaz of the proposed filing. Shortly after, on May 31, Appelt faxed a letter to InSITE, on the letterhead of Mutual Energy, purporting to terminate the Agreement. (Complaint Exh. 7)

The Debtor's bankruptcy petition was filed on June 1, 2001. The Debtor filed the instant adversary proceeding on November 2, 2001.

## B. The Rule 12(b)(6) Standard

A complaint may not be dismissed under Bankruptcy Rule 7012(b)(6), incorporating Federal Rule of Civil Procedure Rule 12(b)(6), unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *Accord Sweet v. Sheahan,* 235 F.3d 80 (2d Cir.2000) (stating that "[d]ismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief"). In reviewing a motion to dismiss, the court may consider the allegations in the complaint, together with "any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner,* 282 F.3d 147, 152 (2d Cir.2002). Upon consideration of the allegations contained in the complaint, including any exhibits attached thereto, the court is obligated to accept all of the allegations in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *Todd v. Exxon Corp.,* 275 F.3d 191, 197 (2d Cir.2001). The scope of the court's review of a motion to dismiss is limited. The "issue is not whether a plaintiff will ultimately prevail but whether the claim-

ant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995). Accordingly, "a complaint should not be dismissed merely because a plaintiff's allegations do not support the particular legal theory that he advances, for the court is under a duty to examine the complaint to determine if the allegations provide for relief under any possible theory." *Bowers v. Hardwick,* 478 U.S. 186, 201, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (citations omitted).

It is with these legal standards in mind that this Court will consider the allegations in the complaint and the exhibits attached thereto.

### C. Mutual Energy's Motion to Dismiss

#### 1. The First Claim: Equitable Estoppel

■ Plaintiff's first claim is that Mutual Energy should be equitably estopped from effectuating the termination of the services Agreement as of May 31, 2001 in effect, that there should be an equitable reinstatement of the Agreement. Mutual Energy argues that this claim should be dismissed because the Plaintiff has failed to properly plead a claim for equitable estoppel and that the equities do not favor reinstating the Agreement. Furthermore, relying primarily on Bankruptcy Rule 7009(b), incorporating Rule 9(b) of the Federal Rules of Civil Procedure, Mutual Energy argues that the Plaintiff has failed to plead its claim with sufficient specificity.

■ To invoke the doctrine of equitable estoppel successfully, a plaintiff must establish that (i) the defendant made a definite misrepresentation of fact and had reason to believe that the plaintiff would rely on it; and (ii) the plaintiff reasonably

relied on that misrepresentation to its detriment. *Buttry v. General Signal Corp.,* 68 F.3d 1488, 1493 (2d Cir.1995). When pleading a claim of equitable estoppel, the plaintiff must allege a misrepresentation or conduct that induces delay, and reliance or any other facts from which it can be inferred that the plaintiff forbore in some way. *Id; see also, Shields v. School of Law of Hofstra University,* 77 A.D.2d 867, 868, 431 N.Y.S.2d 60, 62 (2d Dep't 1980). The doctrine is frequently invoked in cases where the plaintiff is aware of a cause of action and contends that the defendant's conduct caused a delay in bringing suit. *See, e.g., Strachova v. The Metropolitan Museum of Art,* 98 Civ 8505(RPP), 1999 WL 566305, at *6, 1999 U.S. Dist. LEXIS 11791, at *19–20 (S.D.N.Y. Aug. 3, 1999). It has been applied in bankruptcy cases in circumstances somewhat similar to those at bar. *See Bronx–Westchester Mack Corp.,* 4 B.R. 730 (Bankr.S.D.N.Y.1980).

■ Since one of the elements of equitable estoppel is misrepresentation, Bankruptcy Rule 7009(b), incorporating Rule 9(b) of the Federal Rules of Civil Procedure, is applicable, providing that, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy this requirement, a complaint must specify (i) precisely what statements were made, (ii) when and where the statements were made, (iii) identify the person who made the statements, and (iv) explain why the statements were fraudulent. *Stevelman v. Alias Research Inc. et al.,* 174 F.3d 79, 84 (2d Cir.1999). Rule 9(b) requires a claimant in effect to provide the "who, what, when and where" of its claim. *Id.*

The Plaintiff has pleaded the following with respect to the alleged misrepresentation and its reliance: (i) at a meeting held on April 26, 2001, the Plaintiff informed Messrs. Appelt and Goumaz that it would

have to seek bankruptcy protection. At that time, Goumaz requested and obtained a promise from the Plaintiff that the Plaintiff would inform him if it were to file bankruptcy (Complaint ¶ 67); (ii) in late April 2001, Goumaz assured the Plaintiff's CEO that the defendant Mutual Energy would not terminate the Agreement (*Id.* ¶ 68); (iii) during a meeting held on or about May 24, 2001, InSITE's president, an officer of Enlogix and Goumaz met, and during that meeting Goumaz repeated his earlier assurance that the Agreement would not be terminated (*Id.* ¶ 72); (iv) on May 31, 2001 the Plaintiff instructed its counsel to file a bankruptcy petition and informed Goumaz that it was going to do so (*Id.* ¶ 74); (v) shortly after advising Goumaz of the bankruptcy filing, Appelt faxed a letter purporting to terminate the Agreement (*Id.* ¶ 75); (vi) in reliance upon Goumaz's assurance that Mutual Energy would not terminate the Agreement, the Plaintiff had delayed the filing of its bankruptcy petition and had given defendants advance notice (*Id.* ¶ 85); (vii) by receiving advance notice of the Plaintiff's intention to file, the Defendant was able to send a notice of termination of the Agreement, thereby being able to claim it was the victor in the race to the courthouse (*Id.* ¶ 87–88).

Notwithstanding these allegations, the complaint remains ambiguous as to both the representation made and Plaintiff's subsequent reliance. Complaint ¶ 85 states that "InSITE relied upon Robert Goumaz's assurance that ME, despite the April 17, 2001 notice to cure, would not terminate the Agreement. Based upon

that assurance, InSITE delayed ordering its counsel to file a bankruptcy petition, and also agreed to inform Mr. Goumaz if it were going to file a bankruptcy petition." Complaint ¶ 68 is significantly different, alleging: "Mr. Goumaz took a softer line with InSITE. In or about late April 2001, Mr. Goumaz assured InSITE's CEO that ME would not terminate the Agreement. Mr. Goumaz told InSITE's CEO that ME simply wanted InSITE to 'fix the problems.'" In accord with ¶ 68 of the complaint, Plaintiff's opposition to the motions to dismiss generally abandons the contention that Goumaz assured Plaintiff that Mutual Energy would "not terminate the Agreement." It stresses that Mutual Energy promised that it would not terminate the Agreement if InSITE would "fix the problems" prior to the Texas "go live" date. (*See* Plaintiff's Memo at 25). Plaintiff adopts this construction of the complaint in its memorandum presumably to counter Mutual Energy's argument that a promise never to terminate a contract is so broad as to be absurd on its face and, in any event, is unenforceable under the New York Statute of Frauds as a contract not to be performed in one year.[1]

A promise not to terminate the contract if InSITE "fixed the problems" appears to be a promise that could be reasonably relied on. See *Bronx–Westchester Mack Corp.*, where the promise was not to terminate the contract until our meeting "next week." 4 B.R. at 732. But it is not possible to conclude, on the present state of the pleadings, that Plaintiff has adequately pleaded the precise misrepresentation made and its reasonable reliance. In the

---

1. N.Y. Gen. Oblig. Law § 5–701 renders unenforceable an oral contract that cannot be performed in one year, such as a promise "never" to terminate a contract which has more than one year to run. However, it appears that under New York law an oral promise that is reasonably relied on can give

rise to an equitable estoppel even if the promise would otherwise be unenforceable by reason of the Statute of Frauds. *See generally, Royce v. Rymkevitch,* 29 A.D.2d 1029, 289 N.Y.S.2d 598 (3d Dept.1968); *cf. Lusker v. Tannen,* 90 A.D.2d 118, 456 N.Y.S.2d 354 (1st Dept.1982).

formulation of the promise as set forth in ¶ 68 of the complaint and in Plaintiff's Memorandum of Law, Goumaz did no more than promise to perform in accordance with the contract namely, if InSITE cured its defaults ("fixed the problems"), Defendants would not terminate the contract. There is no allegation in this formulation that Goumaz gave InSITE any particular period of time to "fix the problems," much less the full eight months prior to the Texas "go live" date. Whether Goumaz made an illusory promise, or merely a promise to perform in accordance with an existing agreement, it is not obvious that this was a promise upon which Plaintiff could have separately and reasonably relied.

■ There are cases that have applied the doctrine of promissory estoppel where the promise would in other contexts be held to be illusory. *See generally* Metzger and Phillips, *Promissory Estoppel and Reliance on Illusory Promises*, 44 Sw. L.J. 841 (1990); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 73 (1981); 4 WILLISTON ON CONTRACTS § 8.6 (Lord ed.1992). But New York law requires in any event "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise was made...." *Ripple's of Clearview v. LeHavre Assoc.*, 88 A.D.2d 120, 452 N.Y.S.2d 447 (2d Dept. 1982). Defendants should not have to guess as to the exact representation Goumaz is alleged to have made, nor should Plaintiff fail to explain exactly how it relied on that promise to its detriment. In this regard, the complaint is also ambiguous in pleading reliance. There is no dispute that Plaintiff gave advance notice to Goumaz that it intended to file a Chap-

ter 11 petition, and this action certainly would support a claim of reliance on his promise not to terminate. But there does not appear to be any dispute that InSITE intended to file its chapter 11 petition on May 31 (Complaint ¶ 75), and presumably to do so prior to receipt of any termination notice from Mutual Energy. By its own word, Plaintiff failed to file first because of the unavailability of the Court's electronic filing system.[2]

In sum, if Plaintiff is claiming that Defendants promised they would not terminate the Agreement if InSITE "fixed the problems," and if Plaintiff can plead that reliance on this promise was reasonable, it must state its claim explicitly. *Alusit Ltd. v. Aluglas of Pennsylvania, et al.*, 89 Civ. 3849(CSH), 1990 WL 209422, at *1, *5–*6, 1990 U.S. Dist. LEXIS 16755, at *1, *16–*18 (S.D.N.Y.1990). On the present record the Court finds that the pleading of the first claim for relief is deficient, and it will be dismissed, with leave to Plaintiff to replead. *See* Bankr.Rule 7015(a), incorporating Rule 15 of the Federal Rules of Civil Procedure.

## 2. The Second Claim: Misappropriation of Trade Secrets

■ A claimant seeking relief on grounds of misappropriation of trade secrets must allege that it possessed a trade secret and that the defendant used that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery of the secret by improper means. *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 172 (2d Cir.1990).

In support of its motion to dismiss, Mutual Energy argues that the Plaintiff's

---

2. In support of its motion to dismiss, Mutual Energy has asked the Court to take judicial notice that many bankruptcy cases were electronically filed on May 31, 2001, as an effort

to counter Plaintiff's claim that it was unable to effect an electronic filing on that date. It is hard to determine of what this is probative, however.

claim for misappropriation of trade secrets should be dismissed because the complaint lacks specificity in detailing the trade secrets at issue and fails to allege adequately that Mutual Energy misappropriated any such secrets. Alternatively, Mutual Energy maintains that it owned the alleged appropriated material. For the reasons stated below, the Court rejects the Defendant's argument.

The complaint alleges that in response to a need for billing services in the newly deregulated electricity retail markets (Complaint ¶ 17), Plaintiff developed a Web-based billing application that consists of secret business and technical processes, which gave it an advantage over competing billing service providers. (*Id.* ¶ 19–21). Additionally, the Plaintiff alleges that prior to the events giving rise to the underlying adversary proceeding, it restricted internal access to its Enerbill processes, required all consultants to sign confidentiality agreements and refused to disseminate copies of the processes outside of the company. (*Id.* ¶ 21). These facts sufficiently allege the first element of a claim for misappropriation of trade secrets, the existence of a secret and the Plaintiff's efforts to protect it. Mutual Energy insists that the complaint does not adequately identify the secrets, but the fact that Mutual Energy understands the processes at issue is highlighted in its own pleadings. As noted above, at the same time as it avers that it does not know what processes the Plaintiff is claiming as a trade secret, Mutual Energy claims to own the very thing that the Plaintiff is attempting to defend. (Mutual Energy Memo at 29–30.)

It may be, as Mutual Energy argues, that all or some of the alleged trade secrets may not have had such status or may have been developed during the time the Agreement was in effect (with Mutual Energy having rights to the processes under the contract), but this cannot be determined on the pleadings. *Kosower v. Gutowitz*, 00 Civ. 9011(JGK), 2001 WL 1488440, at *8, 2001 U.S. Dist. LEXIS 19111, at *26–*27 (S.D.N.Y. Nov. 21, 2001) (holding that the issues whether the items are trade secrets and whether the defendant owed a duty of confidence cannot be decided on a motion to dismiss). Indeed, it is well settled that the issue of whether a trade secret exists is a question of fact that ordinarily cannot be decided on a motion to dismiss. *See e.g., LinkCo., Inc. v. Fujitsu Ltd.*, 00 Civ. 7242(SAS), 2002 WL 237838, at *3, 2002 U.S. Dist. LEXIS 2543, at *10 (S.D.N.Y.2002) (quoting *Integrated Cash Mgmt., supra*, 920 F.2d at 174); *accord Kosower*, 2001 WL 1488440, at *8, 2001 U.S. Dist. LEXIS 19111, at *26–*27; *Julie Research Laboratories, Inc. v. Select Photographic Engineering, Inc.*, 810 F.Supp. 513, 519 (S.D.N.Y.1992) (quoting *Lehman v. Dow Jones & Co.*, 783 F.2d 285, 298 (2d Cir.1986)); *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 604 N.Y.S.2d 912 (1993).

As for the second element, the Plaintiff alleges that the defendant Mutual Energy obtained the Plaintiff's "secret pre-existing" Enerbill processes by employing a stratagem. Section 2.10 of the Agreement authorized Mutual Energy to perform audits, and the complaint claims that Mutual Energy contended that it needed a copy of the processes to perform such an audit. The Plaintiff alleges that it turned over the materials with the understanding that they would be used for the limited purpose of performing an audit. (Complaint ¶ 43–44). In addition to alleging that Mutual Energy received the information under a pretext, the Plaintiff alleges that the defendant has used, or is using, the information to develop its own in-house billing service. (*See*

*Id.* ¶¶ 77–79).[3]

On a motion to dismiss, the foregoing allegations must be assumed to be true, and all inferences must be drawn in favor of the plaintiff. The Complaint thus contains sufficient allegations that Mutual Energy appropriated the trade secrets by improper means and states a claim for misappropriation of trade secrets. *See Universal Marine Medical Supply, Inc. v. Lovecchio,* 8 F.Supp.2d 214, 222 (E.D.N.Y. 1998); *Ez–Tixz, Inc. v. Hit–Tix, Inc. et al.,* 919 F.Supp. 728, 737 (S.D.N.Y.1996); *777388 Ontario Limited v. Lencore Acoustics Corp.,* 105 F.Supp.2d 56, 65 (E.D.N.Y. 2000).

### 3. The Third Claim: Copyright Infringement

■ It appears that Plaintiff filed certain of its material for copyright protection on October 18, 2001. As an analogue of sorts to its claim of misappropriation of trade secrets, it claims that Mutual Energy unlawfully copied its protected material subsequent to the copyright filings.

■ To withstand a motion to dismiss, a complaint claiming copyright infringement must allege "(1) which specific original works are the subject of the copyright claim, (2) that the plaintiff owns the copyrights in these works, (3) that the copyrights have been registered in accordance with the statute, and (4) by what acts during what time the defendant infringed the copyright." *Kelly v. L.L. Cool J.,* 145 F.R.D. 32, 36 (S.D.N.Y.1992), *aff'd* 23 F.3d 398 (2d Cir.1994). Essentially, Mutual En-

ergy argues that the instant complaint fails to allege facts that satisfy the first and fourth requirements, to wit, to describe the portion of the protected material has been infringed, and to allege the specific acts of the Defendant that infringed the copyright. Mutual Energy further avers that the material in question is not subject to copyright protection.

With regard to the first element, at several points throughout the thirty-four page complaint, InSITE alleges that EnerBill is the process at issue. (*See e.g.,* Complaint ¶¶ 20, 21, 43, 78, 79, 95–97.) Although Mutual Energy argues that this description does not give it adequate notice, the Defendant has attached to its motion a copy of the very processes that the Plaintiff strains to describe along with the applicable copyright registration. This is not a case where the Plaintiff can fairly be expected to specify each and every individual computer keystroke that it claims was copied. Mutual Energy's own papers demonstrate that it understands what it is alleged to have copied. *See Twinlab Corp. v. Signature Media Services, Inc.,* 99 Civ. 169(AGS), 1999 WL 1115237, at *5–*6, 1999 U.S. Dist. LEXIS 18973, at *18–*19 (S.D.N.Y. Dec. 7, 1999); *Krasselt v. Joseph Seagram & Sons, Inc.,* 01 Civ. 2821(RCC), 2002 WL 1997926, at *2–*3, 2002 U.S. Dist. LEXIS 16136, at *5–*7 (S.D.N.Y. August 28, 2002) (citing cases in which courts have denied motions to dismiss despite the complaint's lack of details as to infringement).

---

**3.** Mutual Energy engages in an elaborate effort to find, in the complaint's use of the single word, "ostensibly," a concession that InSITE never believed that Mutual Energy really wanted the processes to perform an audit. There may be a question of fact as to whether InSITE was duped, but there is no concession in the complaint, from use of the word "ostensibly," that Plaintiff knew all

along of Mutual Energy's alleged duplicity. Nor can Mutual Energy justify dismissal of the complaint on the ground that InSITE disclosed the processes publicly by filing for copyright protection. The alleged misappropriation allegedly took place prior to the date on which InSITE copyrighted the material at issue.

Regarding the fourth requirement, the Plaintiff has alleged that it gave Mutual Energy a copy of the processes in December 2000 because it was told that an audit would be performed. The complaint further alleges that at some point in 2001, Mutual Energy began to develop its own in-house billing service. Taking all allegations in the complaint as true, and drawing all reasonable inferences in favor of the Plaintiff, this Court finds adequate to withstand a motion to dismiss the Plaintiff's claims that the Defendant began developing its own in-house billing process by using some, if not all, of the information that it obtained from the Plaintiff in violation of its copyright protection. *See generally Tuff–N–Rumble Management, Inc. v. Sugarhill Music Publishing, Inc.*, 8 F.Supp.2d 357, 362 (S.D.N.Y.1998) (dispute as to which party had right to use copyrighted material could not be resolved on motion to dismiss).

Nor can Mutual Energy obtain summary dismissal of the complaint on the ground that the material was not subject to copyright because at certain points in the complaint Plaintiff calls Enerbill a "process." (*E.g.*, Complaint ¶ 20). A process, like an idea, is not subject to copyright. 17 U.S.C. § 102(b). However, even if "the method which instructs the computer to perform its operating functions" is not subject to copyright protection, "the instructions themselves" are. *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3d Cir.1983). As the Court said there, "since it is only the instructions which are protected, a process is no more involved ... than it would be if instructions were written in ordinary English in a manual which described the necessary steps to activate an intricate complicated machine." *Id.* at 1251. It may be that the material at issue here is closer to a computer menu command, which was held not subject to copyright protection in *Lotus Development Corp. v. Borland Int'l Inc.*, 49 F.3d 807 (1st Cir.1995), *aff'd by an equally divided court*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996), than it is to the computer program in *Autoskill Inc. v. Nat'l Educational Support Systems, Inc.*, 994 F.2d 1476 (10th Cir.1993), which was copyrightable. But this cannot be determined on this motion to dismiss.

 Finally, Mutual Energy claims that Plaintiff is judicially estopped from claiming ownership of either a trade secret or a copyright by its failure to list either as an asset in its initial Schedules of Assets filed with this Court. However, after the motion to dismiss was filed, the Debtor amended the schedules to show its claim of ownership of a trade secret and a copyright. Bankruptcy Rule 1009(a), which provides that a schedule may be "amended by the debtor as a matter of course at any time before the case is closed," gives the Debtor a broad right to file this amendment. Even if it did not, the doctrine of judicial estoppel in bankruptcy is bottomed on the principle that the court should not condone certain behavior that obtains the debtor a benefit or a discharge at the expense of creditors. *Payless Wholesale Distribs., Inc. v. Alberto Culver (P.R.) Inc.*, 989 F.2d 570, 571 (1st Cir.) *cert. denied*, 510 U.S. 931, 114 S.Ct. 344, 126 L.Ed.2d 309 (1993). Here, Mutual Energy has not been subjected to any unfairness in having to respond to the claims against it, and it cannot possibly have been misled by the Debtor's schedules as first filed. Moreover, it would be the Debtor's general creditors who would be harmed by summary dismissal of its complaint. The motion to dismiss the third claim is denied.

### 4. The Fourth Claim: Breach of Contract

The Plaintiff has asserted a claim for breach of contract against Mutual Energy

based on at least five breaches of the services Agreement. The first is the purported termination of the Agreement for cause; it is the Plaintiff's position that it was in compliance with the contract at the time that Mutual Energy informed it that the Agreement would be terminated for cause. The second alleged breach is based on the Defendants' failure to pay the Plaintiff $500,000 for services rendered. The third and fourth breaches are founded upon Mutual Energy's alleged unauthorized and unlicensed use of the Plaintiff's pre-existing EnerBill processes and other proprietary materials. The last alleged breach is based on the Defendants' solicitation of InSITE employees and consultants without authorization.

In response to the allegations contained in the complaint, and in support of its motion to dismiss, Mutual Energy has asserted, in substance, that the Plaintiff was in material breach of the contract in that it failed to meet its contractual responsibilities relating to communication and relationships with third parties; failed to provide job specifications to Key Personnel (as that term is defined in the Agreement); and failed to update desktop procedures.

■ A claim for relief sounding in breach of contract must allege the following: (i) the existence of an agreement, (ii) adequate performance of the contract by the plaintiff, (iii) breach of contract by the defendant, and (iv) damages. *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d Cir. 1996). In its motion to dismiss, Mutual Energy focuses on the second element and argues that the Plaintiff has not only failed to allege its "adequate performance of the contract," but that the "record" demonstrates conclusively that InSITE committed material breaches of contract, failed to cure these breaches after receiving proper notice, and cannot establish due performance.

■ It is not necessary for a plaintiff claiming breach of contract to "specifically state each element individually." *R.H. Damon & Co., Inc. v. Softkey Software Products, Inc.,* 811 F.Supp. 986, 991 (S.D.N.Y.1993). Courts rarely dismiss on the ground that the plaintiff has not included the talismanic words, "due performance," in its complaint. *See, ICD Holdings S.A. v. Frankel,* 976 F.Supp. 234, 242–43 (S.D.N.Y.1997) (holding that it is not clear that a plaintiff is required to plead its own due performance in order to properly state a claim upon which relief can be granted); *Tagare v. NYNEX Network Systems Co.,* 921 F.Supp. 1146, 1150 (S.D.N.Y.1996) (complaint was devoid of any allegation of due performance on part of plaintiff, but court refused to dismiss a claim for breach of contract on ground that a plaintiff, alleging that defendant interfered with and prevented plaintiff's performance, is entitled to prove these claims); *Reuben H. Donnelley Corp. v. Mark I Marketing Corp.,* 893 F.Supp. 285, 291 (S.D.N.Y.1995) (given the court's duty to construe the pleadings to do "substantial justice," it was improper to dismiss the defendant's counterclaims despite finding that defendant failed to allege due performance).

In any event, Mutual Energy also claims that the "record" shows that InSITE was in breach of contract, relying on the letters that the parties exchanged prior to the commencement of the Chapter 11 proceeding. These include the initial letter in which Defendants claimed that InSITE was in default under the services Agreement and demanded cure within the contractual period; InSITE's response; a rejoinder thereto; and the final letter purporting to terminate the contract. Mutual Energy reads the letters sent by Plaintiff as conceding that there were problems involving its performance under the con-

tract and that, since any written document attached to the complaint can be taken into consideration on a motion to dismiss, *Chambers v. Time Warner, Inc., supra,* 282 F.3d at 152, InSITE has admitted that it breached the contract and that Mutual Energy acted appropriately in terminating it.

 Mutual Energy's imaginative argument fails for two substantial reasons. First, it misreads the letters. Although InSITE admits to some problems in its performance under the contract in the letters, it consistently maintained that it had adequately performed under the contract and was not in default, or at least that any defaults had been the result of Mutual Energy's breaches or omissions.[4] The issue whether there were any breaches on the part of InSITE is hotly disputed throughout the correspondence, and a motion to dismiss is not the vehicle by which they can be determined. *Campo v. 1st Nationwide Bank,* 857 F.Supp. 264, 270 (E.D.N.Y.1994). As the courts have stated repeatedly, the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to have its complaint heard." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (citations omitted).

Second, Mutual Energy attempts to prove from these letters not only that the Plaintiff was in breach, but that these breaches were material. As the record has not been fully developed, it would be premature for this Court to find that any shortcomings on the part of InSITE were material and justified termination of the agreement for cause. *See e.g., Lipsky v. Commonwealth United Corp.,* 551 F.2d 887, 897 (2d Cir.1976) (reversing district court's order dismissing plaintiff's com-

plaint on grounds that materiality could not be decided on the complaint alone).

**5. Breach of the Duty of Good Faith and Fair Dealing**

The Plaintiff's fifth and final claim for relief is grounded on Mutual Energy's alleged breach of the duty of good faith and fair dealing. The Plaintiff alleges the following: (i) Mutual Energy acted in bad faith when it requested a copy of InSITE's pre-existing intellectual property; (ii) AEP and AEP Services acted in bad faith when they purported to encourage InSITE to seek a strategic partner and then, after a delay, refused to approve the arrangement; (iii) neither AEP, AEP Services or Mutual Energy had a good faith belief that the Plaintiff was in breach when they issued the termination letter and notice to cure; and (iv) the Defendants acted with malice when they purported to terminate the Agreement for cause, so as to preserve a right to solicit InSITE's personnel and to use InSITE's intellectual property for their own purposes. Therefore, termination "for cause" was also in bad faith.

 Mutual Energy argues that breaches (i), (iii) and (iv) above merely duplicate the Plaintiff's other breach of contract claims and as such should be dismissed. Under New York law, the governing law under the Agreement, there is an implied duty of good faith and fair dealing in all contracts. *Travellers International, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir.1994) (citations omitted). However, as Mutual Energy argues, a claim for breach of the duty of good faith and fair dealing cannot merely mirror a claim for breach of contract. If it does, it should be dismissed. *See e.g.,*

---

4. Indeed, InSITE maintains so consistently that it performed under the contract that the Court could use these letters to supply any

omission in the complaint of an allegation of due performance on the part of the Plaintiff.

*Village on Canon v. Bankers Trust Co.,* 920 F.Supp. 520, 535 (S.D.N.Y.1996).

Here, the claim for breach of the duty of good faith does not merely repeat the claim for contractual breach. Although the conduct cited in the complaint to support the claim of bad faith is substantially the same conduct cited in the Plaintiff's breach of contract claims, there is a critical distinction. In asserting a cause of action sounding in breach of contract, a claimant must allege that the defendant failed to perform. Thus, the focus in such a claim is the defendant's non-performance. Allegations of non-performance may or may not include assertions that the breaching party acted in bad faith, and these allegations may or may not be relevant on the breach of contract counts. By contrast, the essence of a claim for breach of the duty of good faith and fair dealing is not the defendant's acts *per se,* but the scienter behind those acts. The analysis therefore is not whether there was contractual performance or non-performance. The focal point is whether the defendant demonstrated honesty in fact and observed reasonable commercial standards of fair dealing. *See, e.g.,* Restatement (Second) of Contracts § 205 (1981). In the instant case the Plaintiff is not simply alleging non-performance on the part of Mutual Energy. The Plaintiff is alleging that Mutual Energy, along with its co-defendants, acted in bad faith. The Plaintiff's argument is that rather than staying true to the goal of the Agreement, the Defendants chose to pursue their own goals and to act in their own interest, contrary to the agreed upon purpose of the Agreement. These allegations are different from the allegations of breach of contract and may entitle the Plaintiff to different relief. *See e.g., Tagare,* 921 F.Supp. at 1150; *US Airways Group, Inc. v. British Airways PLC.,* 989 F.Supp. 482, 492 (S.D.N.Y.1997).

Regarding breach (ii) above, Mutual Energy attempts to use excerpts from Exhibit 6 attached to the complaint to justify summary dismissal of this claim. As appears from this letter, following a meeting between Goumaz and representatives of InSITE and Enlogix, InSITE sent a letter to Goumaz thanking him for taking the time to meet and expressing optimism about the future of the parties' business relationship. Mutual Energy quotes language from this letter and extracts the conclusion that the Plaintiff's claim for breach of the covenant of good faith and fair dealing is demonstrably false. Mutual Energy also contends that the "essence of InSITE's theory is that Mutual Energy did not agree to modify the Services Agreement" (Mutual Energy Memo at 51), that the contract did not contain a requirement that Mutual Energy agree to negotiate an amendment thereto, and that Plaintiff's argument is that Mutual Energy should have acted in a manner inconsistent with the terms of its own contract.

There is no question that "The duty of good faith and fair dealing ... is not without limits, and no obligation can be implied that would be inconsistent with other terms of the contractual relationship." *Dalton v. Educ. Testing Serv.,* 87 N.Y.2d 384, 389, 663 N.E.2d 289, 291, 639 N.Y.S.2d 977, 979 (1995). However, for purposes of this motion to dismiss, Mutual Energy makes too much of the letter it relies on. Mutual Energy cannot write out of the complaint all of the allegations that Defendants maliciously and for ulterior purposes refused to allow the Debtor to obtain financing from a strategic partner and thereby sabotaged its business prospects. The truth of these allegations cannot be determined on this motion to dismiss, but they cannot be deemed to be

false because of a "thank-you" letter sent in the course of months of dealings between the parties.

### D. Motion to Dismiss of AEP and AEP Services

 AEP and AEP Services have separately moved to dismiss the Complaint on the ground that they were not parties to the contract at issue, that there are no allegations that they misappropriated trade secrets or copied copyrighted material, and that all actions complained of were those of Mutual Energy. In response to Plaintiff's assertion that the corporate veil should be pierced and that they should be held liable together with their subsidiary, they contend that the Complaint is devoid of the required allegations that they so dominated and controlled a separate corporation, Mutual Energy, and used it to such inequitable ends that the corporate shield should be pierced. Under applicable New York law, they argue, the complaint should be dismissed against them.[5]

The New York standard on corporate veil piercing has been stated and restated in many cases; a recent decision of the Court of Appeals, *Morris v. New York State Dept. of Taxation & Finance*, 82 N.Y.2d 135, 623 N.E.2d 1157, 603 N.Y.S.2d 807 (1993), is relied on by Defendants as authoritative. There the Court held that

> Because a decision whether to pierce the corporate veil in a given instance will necessarily depend on the attendant facts and equities, the New York cases may not be reduced to definitive rules governing the varying circumstances when the power may be exercised ...

Generally, however, piercing the corporate veil requires a showing that: (1) the owners exercised complete domination of the corporation in respect of the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff.

82 N.Y.2d at 141, 603 N.Y.S.2d 807, 623 N.E.2d 1157 The Court went on to say that "domination, standing alone, is not enough; some showing of a wrongful or unjust act toward plaintiff is required ... The party seeking to pierce the corporate veil must establish that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party such that a court in equity will intervene." *Id.,* at 141–42, 603 N.Y.S.2d 807, 623 N.E.2d 1157. *See also, Lowendahl v. The Baltimore and Ohio Railroad Co.,* 247 A.D. 144, 287 N.Y.S. 62 (1st Dept.) *aff'd* 272 N.Y. 360, 6 N.E.2d 56 (1936); *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 853 (2d Cir.1985); *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., et al.,* 933 F.2d 131, 138 (2d Cir.1991); *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club International, Inc.,* 758 F.Supp. 908, 914 (S.D.N.Y.1991).

Defendants AEP and AEP Services seize on one phrase in *Morris* and allege that the complaint here must be dismissed because it does not establish that the owners perpetrated a wrong by abusing "the privilege of doing business in the corporate form...." 82 N.Y.2d at 142, 603 N.Y.S.2d 807, 623 N.E.2d 1157. They suggest that the complaint is deficient because it does not demonstrate, for example, that Mutual Energy was undercapitalized or that the

---

5. As noted above, there is no dispute among the parties that New York law controls on this as well as all other issues. It is the underlying law of the contract, and the New York principles on veil piercing have been cited and relied on by both parties. *See* AEP and AEP Services Reply Brief at 1, note 1, citing *American Fuel Corp. v. Utah Energy Dev. Co., Inc.,* 122 F.3d 130, 134 (2d Cir.1997); *see also* Plaintiff's Memo at 2.

formalities of separate corporate existence were not observed. In the Defendants' view, the Plaintiff has failed "even to attempt to address" the ten factors identified by the Second Circuit in the *Passalacqua* case cited above as indicia of "abuse of the privilege of doing business in corporate form" that could, in an appropriate case, justify corporate veil-piercing.

■ In *Passalacqua*, the Second Circuit listed the following factors to be considered in connection with a determination whether to pierce the corporate veil, including:

(1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

*Id.* at 139. Despite the listing of these factors, the Court cautioned in *Passalacqua*, there are an "infinite variety of situations" that might call for disregarding the corporate veil, and the ultimate question of veil piercing must be decided by "considering the totality of the evidence." *Id.*

In the instant complaint, Plaintiff does not seek to pierce the corporate veil on the ground that Mutual Energy was undercapitalized or that its books and records were not kept separately from those of the other subsidiaries of AEP. The key allegation in this case is that AEP and AEP Services used their control over Mutual Energy for their own purposes and to that extent the subsidiary had no separate purpose or existence. In considering the motion to dismiss, with all inferences drawn in Plaintiff's favor, the complaint adequately alleges facts to show domination and control of Mutual Energy on the part of AEP and/or AEP Services with respect to the contractual relationship with Plaintiff, the termination of the contract, and the benefits that would accrue from such termination.

■ As *Passalacqua, Morris* and the other cases relied on by Defendants all emphasize, control must be demonstrated "in respect to the transaction attacked," and it is not determinative that Mutual Energy may have had a separate existence vis-à-vis its retail customers. Thus, the complaint alleges that Goumaz and Appelt, who acted on behalf of all defendants, were officers or employees of AEP Services and AEP, respectively, and were solely responsible for negotiating the terms of the Services Agreement.[6] It is specifically alleged that AEP and AEP Services terminated the InSITE contract so that they could develop an in-house computer capability that would make Mutual Energy more valuable to them when they sold it on the open market, for their own benefit and not that of Mutual Energy. (Complaint ¶ 22).

---

6. At this early stage of the case we do not know when either became an employee or officer of Mutual Energy, or if they both did.

AEP and AEP Services, not Mutual Energy, are also identified in the complaint as the entities directly, and solely, involved in the process of selecting a billing service provider and negotiating the Services Agreement. (*Id.* ¶¶ 24 27). It is alleged that AEP, not Mutual Energy, eventually notified InSITE that it was dropping its plans to enter the Ohio market and that the Texas project would be delayed. (*Id.* ¶ 49). InSITE further alleges that it was Goumaz of AEP Services who asserted that InSITE was in breach of the Agreement and provided InSITE a list of the purported breaches, and other related correspondence, on AEP Services letterhead (*Id.* at Exh. 2).[7] The complaint further alleges that it was AEP that abruptly ended the negotiations and sabotaged InSITE's search for a strategic partner, and that AEP requested that it be informed of a bankruptcy filing, to allow it to terminate the Agreement before the Plaintiff could file. Throughout its complaint, InSITE points to AEP and/or AEP Services as the puppeteer controlling Mutual Energy as the marionette. All of the aforementioned allegations go toward the control element necessary to justify veil piercing and are sufficiently pleaded at this stage to withstand a motion a dismiss.

In *Gorrill v. Icelandair/Flugleidir, supra,* the Second Circuit sustained a judgment against a corporation, finding it responsible for its subsidiary's breach of employment contracts with certain employees. The facts after trial demonstrated that the parent had directed the subsidiary to adopt policies for the benefit of the parent, that the CEO of both companies had suggested the unlawful terminations, and that the terminations had breached contracts with the discharged employees. These facts, the Court found, were sufficient to demonstrate control "*in respect of the transaction attacked* " (emphasis in original), and although the plaintiffs did not necessarily demonstrate that a fraud was perpetrated, it was sufficient for them to show that control was used "to perpetrate the violation of a ... positive legal duty or a dishonest or unjust act in contravention of plaintiff's legal rights." 761 F.2d at 853, quoting *Astrocom Electronics Inc. v. Lafayette Radio Electronics Corp.,* 63 A.D.2d 765, 766, 404 N.Y.S.2d 742, 744 (3rd Dept.1978).

■ Defendants AEP and AEP Services strive mightily to distinguish *Gorrill,* claiming that it is inconsistent with the later decisions in *Passalacqua* and *Morris.* (Reply Br. at 12). But *Passalacqua* cites *Gorrill,* 933 F.2d at 138, and does not, as Defendants would have it, require the plaintiff to treat the 10 cited factors in every complaint. Nor does the reference in *Morris* to "misuse of the corporate form" require the plaintiff to show undercapitalization or a failure to observe corporate formalities. As *Morris* and most other cases on point emphasize, it is difficult to set forth rules on veil piercing in light of the infinite variety of fact situations that may arise. The courts have consistently found that the key requirements, to sustain a veil-piercing, are "(i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong." *Thrift Drug, Inc. v. Universal Prescription Adm'rs,* 131 F.3d 95, 97 (2d Cir.1997); *see also Rays Trading (H.K.) Company Limited v. Judy–Philippine, Inc.,* 1998 WL

---

**7.** The complaint alleges (and the attachments demonstrate) that the letter purporting to give InSITE notice that the contract would be terminated if InSITE's breaches were not cured was sent on AEP Services stationery. Defendants say this was a "mistake," but they cannot ask that the Court so presume for purposes of this motion to dismiss.

355422, *4, n. 3, 1998 U.S. Dist. LEXIS 9702 at *14, n. 3 (S.D.N.Y.1998). Based on these principles, and not on a rote invocation of the *Passalacqua* factors, cases since *Morris* have found that a parent corporation, not a party to the agreement, can be held liable for its subsidiary's contractual breach if it is shown that the parent induced the subsidiary to breach the agreement for the parent's benefit and thereby committed a wrong. *Network Enterprises, Inc. v. APBA Productions, Inc.*, 01 Civ 11765(CSH), 2002 WL 31050846, at *4, 2002 U.S. Dist. LEXIS 17256, at *12 (S.D.N.Y. Sept. 12, 2002); *Cary Oil Co., Inc.*, 90 F.Supp.2d at 415; *NetTech Solutions, L.L.C. v. Zippark.com*, 2001 WL 1111966, 2001 U.S.Dist. LEXIS 14753 (S.D.N.Y.2001). *NetTech Solutions* also makes it clear that if the facts warrant, the corporate form can be disregarded to hold a parent liable for a subsidiary's unauthorized use of intellectual property if it is established that the parent was the driving force behind the infringing party's infraction. *NetTech Solutions*, 2001 WL 1111966, at *12, 2001 U.S. Dist. LEXIS 14753 at *34.

Here, AEP and AEP Services may not have done what Plaintiff claims they did. Nevertheless, when ruling on motions to dismiss or even for summary judgment, courts have been reluctant prematurely to dismiss a cause of action alleging corporate veil piercing because of the intensely factual nature of such a claim. *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.*, 2002 WL 31050846, at *4, 2002 U.S. Dist. LEXIS 17256, at *10. *Campo*, 857 F.Supp. 264, 272; *Cary Oil Co., Inc. v. MG Refining and Marketing, Inc.*, 90 F.Supp.2d 401, 415 (S.D.N.Y.2000); *Nettech Solutions, L.L.C. v. Zippark.com*, 2001 WL 1111966, at *11, 2001 U.S. Dist. LEXIS at *32–33 (S.D.N.Y. Sept. 20, 2001); *Carte Blanche*, 758 F.Supp. at 914. Plaintiff has pleaded sufficient facts to sur-vive the instant motion by AEP and AEP Services.

## E. CONCLUSION

The first claim for relief in the complaint is dismissed with leave to Plaintiff to re-plead within 14 days. The motions to dismiss are otherwise denied. The parties are directed to contact chambers within 20 days to obtain a date for a pretrial conference to establish a timetable for further proceedings.

IT IS SO ORDERED.